# Judge Hellerstein

BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
PRESPES SHIPPING CORP.
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

PRESPES SHIPPING CORP.,

        Plaintiff,

    -against-

INDEPENDENT PETROLEUM GROUP S.A.K.,

        Defendant.

---------------------------------------------------------------X

09 Civ.

## VERIFIED COMPLAINT

Plaintiff, PRESPES SHIPPING CORP. ("Plaintiff"), by its attorneys, Brown Gavalas & Fromm LLP, as and for its Verified Complaint against defendant, INDEPENDENT PETROLEUM GROUP S.A.K. ("Defendant"), alleges upon information and belief as follows:

1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has jurisdiction under 28 U.S.C. § 1333.

2.    At all material times, Plaintiff was and now is a corporation duly organized and existing under and by virtue of the laws of the Liberia, with an office and place of business in Liberia.

3.    On information and belief, at all material times Defendant was and still is a corporation existing under and by virtue of the laws of Kuwait, with an office and place of business in Kuwait City, Kuwait.

4.    At all material times, Plaintiff was the registered owner of the motor vessel HELLENIC BLUE ("the Vessel").

5.    On or about November 12, 2008, Plaintiff, as owner, and Defendant, as charterer, entered into an agreement whereby Plaintiff agreed to let and Defendant agreed to hire the Vessel for a one-time voyage to transport a cargo of about 33,000 metric tons of petroleum products from one or two Greek Ports to one or two ports in the Mediterranean Sea, pursuant to certain terms and conditions set forth in the parties' agreement ("the Charterparty"). A copy of the Charterparty is annexed hereto as Exhibit "A".

6.    Plaintiff delivered the Vessel to Defendant in accordance with the terms of the Charterparty, and has otherwise fully discharged its obligations under the Charterparty.

7.    After delivery of the Vessel to Defendant at the port of Agioi Theodori, Greece on November 20, 2009, the Vessel proceeded to the port of Zaharani, Lebanon, pursuant to Defendant's instructions, arriving at Zaharani on or about November 25, 2008. However, due to no fault of Plaintiff, the cargo was rejected for quality reasons by receivers at Zaharani. Defendant then ordered the Vessel to the port of Marsaxlokk, Malta in order to re-blend the cargo and attempt re-delivery to the receivers in Zaharani, Lebanon.

8.    In consideration for Plaintiff's agreement to deviate to Malta to accommodate Defendant's attempt to re-blend the cargo, Defendant agreed on or about December 1, 2008 to pay additional hire to Plaintiff for the voyage from Beirut to Malta at the Charterparty demurrage rate of $20,250.00 per day pro rata. The parties' agreement concerning the voyage to Malta was set out in an Addendum "1" to the Charterparty, a copy of which is annexed hereto as Exhibit "B".

9.    The Vessel did, in fact, deviate to Malta on or about November 28, 2008 pursuant

to Addendum "1" of the Charterparty. However, for its own commercial reasons, Defendant, on or about December 2, 2008, decided to discharge the cargo in Malta and not return to Lebanon to re-deliver the cargo to receivers in Zaharani.

10.     Upon the conclusion of the voyage, Defendant owed freight, including additional hire due to the deviation to Malta, and demurrage to Plaintiff in the total amount of $530,849.09. However, despite the fact that this sum is due and owing, Defendant has only paid freight and demurrage in the amount of $435,799.39. Therefore, a balance of $95,049.70 remains outstanding from Defendant to Plaintiff.

11.     Under the terms of the Charterparty, all disputes between the parties are to be referred to arbitration in London pursuant to English law. Plaintiff intends to commence London arbitration proceedings shortly.

12.     This action is in aid of said London arbitration proceedings in accordance with 9 U.S.C. § 8. Plaintiff seeks to obtain adequate security to satisfy a potential London arbitration award in Plaintiff's favor and against Defendant.

13.     In addition to recovering the principal amount due to Plaintiff under the Charterparty, Plaintiff also fully anticipates recovering interest, costs, and attorneys' fees, which are routinely awarded to the prevailing party in London arbitration proceedings. As best as can now be estimated, Plaintiff expects to recover the following amounts in London arbitration proceedings:

|   |   |   |
|---|---|---|
| a. | On the principal claim | $95,049.70 |
| b. | 2 years of interest at 6.5% per annum, compounded quarterly | $13,082.54 |
| c. | Legal Costs (attorneys' fees, etc.) | $30,000.00[1] |

---

[1] This is based on estimated costs of a single arbitrator at £200/ hour on the basis of a 1-day hearing, including writing the award; say £3,000. Costs of 2 witnesses attending London arbitrations (air fares and hotel

TOTAL                                    $138,132.24

14.     Plaintiff has conducted an investigation as set out in the accompanying affidavit of Peter Skoufalos and Plaintiff verily believes that Defendant cannot be found within the District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure.

15.     Defendant is a multinational petroleum company.  In addition, Defendant occasionally charters vessels to comply with obligations incurred by Defendant in contracts it enters into with other parties.  Consequently, it is believed that Defendant will be making hire and/or freight payments to and from the owners of vessels chartered by Defendant.  Defendant will also be making and receiving dollar-denominated payments in connection with the petroleum products it sells.  Moreover, Defendant will likely be making dollar-denominated payments in payment of its own commercial obligations.

16.     It is the well-established custom and practice of the industry that charter hire or freight paid by charterers for the charter of vessels is payable in United States Dollars.  In addition, bunker fuel for vessels, which must often be paid for by the charterer, and was in fact payable by Defendant under the Charterparty, is customarily quoted and paid for in United States Dollars.  Further, agents' invoices for services and disbursements rendered to vessels at local ports are customarily rendered and paid in United States Dollars.

17.     Defendant provided details for a New York bank in connection with its demand for the return of claimed overpayment of hire, directing Plaintiff to remit funds to an account at J.P. Morgan Chase Bank's New York branch.

18.     Upon information and belief, Defendant cannot be found within the District,

---

accommodation) say £1,500 each; i.e. £3,000.  Lawyer's costs, including submissions, witness statements, disclosure, reporting to clients, say at £270 per hour, i.e. £12,000. Total: £18,000 or $29,597.40, based on a conversion rate of £1 = $1.64430 (See http://www.xe.com/ucc).

within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure, but is believed to have or will have during the pendency of this action assets within this District, specifically including cash, funds, freight, hire, accounts, electronic fund transfers and other property, in the hands of garnishees in the District including, but not limited to, American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are believed to be due and owing to the Defendant.

Plaintiff prays:

A. That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That because the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules, attaching all cash, goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are due and owing to the Defendant, in the amount of $138,132.24, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B, answer the matters alleged;

C.  That this action be stayed and this Court retain jurisdiction over this matter through the entry of any judgment or award, and any appeals thereof; and

D.  That Plaintiff have such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
        September 29, 2009

BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
PRESPES SHIPPING CORP.

By: _____
    Peter Skoufalos (PS-0105)
    355 Lexington Avenue
    New York, New York 10017
    Tel: (212) 983-8500
    Fax: (212) 983-5946

# VERIFICATION

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

PETER SKOUFALOS, being duly sworn, deposes and says:

1.    I am a member of the bar of this Honorable Court and of the firm of Brown Gavalas & Fromm LLP, attorneys for Plaintiff.

2.    I have read the foregoing Verified Complaint and I believe the contents thereof are true.

3.    The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.    The sources of my information and belief are documents provided to me and statements made to me by representatives of the Plaintiff.

PETER SKOUFALOS

Sworn to before me this
29th day of September, 2009

Notary Public

EVAN B. RUDNICKI
Notary Public of the State of New York
No. 02RU6142314
Qualified in Rockland County
Term Expires March 13, 2010

7

# EXHIBIT "A"

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

GENEVA, SWITZERLAND
NOVEMBER 12, 2008
Place/Date                    Date

IT IS THIS DAY AGREED between *PRESPES SHIPPING CORP. LIBERIA*
~~chartered owner/~~ owner (hereinafter called the "Owner") of the *LIBERIAN FLAG*
~~SS/MS~~ *M/T "HELLENIC BLUE"*
(hereinafter called the "Vessel")
and *IPG KUWAIT INDEPENDENT PETROLEUM GROUP S.A.K.*
(hereinafter called the "Charterer")
that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble
and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A. Description and Position of Vessel: *AS PER QUESTIONNAIRE 88 & JAPANESE APPENDIX ATTACHED.*

Deadweight: *44,772.3 METRIC* tons ~~(2240 lbs.)~~    Classed: *DNV*

Loaded draft of Vessel on assigned summer freeboard *12.54 METERS* ~~ft.~~    ~~in.~~ in salt water.

Capacity for cargo: *51,011 CUBIC METERS / SLOPS 1,526 CUBIC METERS AT 98%.* ~~tons (of 2240 lbs. each)~~ ~~% more or less,~~
~~Vessel's option.~~

Coated:        [ *X* ] Yes *EPOXY*        [ ] No

Coiled:        [ ] Yes        [ *X* ] No        Last ~~two~~ *THREE* cargoes:   *NAPHTHA  /  NAPHTHA  /  UMS*

Now: *DISCHARGE AGIO THEODORI WHERE ETA O/A 17TH NOVEMBER* Expected Ready: *ETC NOVEMBER 19TH*

B. Laydays:

Commencing: *NOVEMBER 19, 2008 (0001 HOURS)* Cancelling:  *NOVEMBER 21, 2008 (2359 HOURS)*

C. Loading Port(s):  *ONE (1) OR TWO (2) SAFE PORT(S) GREECE, AGIOI THEODORI - PIRAEUS RANGE*

D. Discharging Port(s):  *ONE (1) OR TWO (2) SAFE PORT(S) MEDITERRANEAN, NOT EAST OF BUT INCLUDING* Charterer's Option
*GREECE; EXCLUDING YUGOSLAVIA / FORMER YUGOSLAVIA / ALBANIA / UN-NATO EMBARGOED COUNTRIES IF
ANY BUT INCLUDING TURKISH MEDITERRANEAN / EGYPTIAN MEDITERRANEAN / CYPRUS (EXLCUDING TOC) /
LEBANON / SYRIA / CROATIA AND SLOVENIA. IF DISCHARGE WITHIN LEBANON ONLY, CHARTERERS OPTION TO
THREE (3) SAFE DISCHARGE PORTS.*

E. Cargo:  *MINIMUM 33,000 METRIC TONS; CHARTERERS' OPTION TO LOAD UP TO FULL CARGO, ONE (1) OR TWO* Charterer's Option
*(2) GRADE(S), CLEAN PETROLEUM PRODUCTS, WITHIN VESSEL'S NATURAL SEGREGATION; UNDYED, UNLEADED
AND UNDARKER THAN 2.5 NPA, EXLCUDING SOLVENTS, CHEMICALS, LUBES AND CASINGHEAD. NO
DEADFREIGHT FOR CHARTERERS' ACCOUNT PROVIDED MINIMUM QUANTITY SUPPLIED. MINIMUM SPECIFIC
GRAVITY 0.74 AT LOADED TEMPERATURE*

Charterer's Option

F.  Freight Rate:  *WORLDSCALE 192.5 - MINIMUM FLAT USD 3.5 PMT; OVERAGE, IF ANY, TO BE AT 50%.*  ~~per ton (of 2240 lbs. each).~~

G.  Freight Payable to:  *REMIT FREIGHT PAYMENT TELEGRAPHICALLY IN U.S. DOLLARS TO:*
*BANK: HSBC BANK PLC*
*93 AKTI MIAOULI PIRAEUS GREECE*
*IBAN: GR4807100010000001019231036*
*ACCOUNT NUMBER: 001-019231-036*
*ACCOUNT NAME: ARION FINANCE INC.* Monrovia, Liberia .
*SWIFT ADDRESS: MIDLGRAA* ~~et~~

H.  Total Laytime in Running Hours:  *EIGHTY-FOUR (84)  - SUNDAYS AND HOLIDAYS INCLUDED*

I.  Demurrage per day:  *USD 20,250*

J.  Commission of   *1.25* %  is payable by Owner to  *MJLF - GENEVA  AND  1.25%  ADDRESS  COMMISSION* on ~~the actual amount freight~~ *ALL MONIES EARNED,* when and ~~as freight~~ *SAME* is paid.

K.  The place of General Average and arbitration proceedings to be London;  *ENGLISH LAW TO APPLY.*  ~~New York (strike out one).~~

L.  ~~Tovalop~~ *ITOPF:* Owner warrants Vessel *is owned or demise chartered by* ~~to be~~ a member of ~~TOVALOP~~ *ITOPF* scheme and will be so maintained throughout duration of this charter.

M.  Special Provisions: *AS ATTCHED.*

*IPG special additional clauses No. 27 to 75 (revised 15th April 2004) as attached herewith deemed to be incorporated in this Charter Party, and shall be considered to be overriding the provisions of clauses 1 to 26 of Part II of this Charter Party, if found conflicting with them.*

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:

*PRESPES SHIPPING CORP. LIBERIA*

By:

Witness the Signature of:

*IPG KUWAIT INDEPENDENT PETROLEUM GROUP S.A.K.*

By:

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

## PART II

1. WARRANTY - VOYAGE - CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat), from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage. *No deadfreight on Charterers' account provided minimum agreed quantity supplied.*

4. NAMING LOADING AND DISCHARGE PORTS.
   (a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports in:
ST. KITTS                           Carribean or U.S. Gulf loading port(s)
PORT SAID                           Eastern Mediterranean or Persian Gulf loading port(s)
                                    (from ports west of Port Said.)

   (b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

Place                               On a voyage to a port or ports in:
LAND'S END                          United Kingdom/Continent (Bordeaux/Hamburg range)
                                    or Scandinavia (including Denmark)
SUEZ                                Mediterranean (from Persian Gulf)
GIBRALTAR                           Mediterranean (from Western Hemisphere).

   (c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used Laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice or readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime, *or demurrage, if on demurrage.* If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime, *or demurrage, if on demurrage;* if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime, *or demurrage, if on demurrage.* Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime, *or demurrage, if on demurrage.*

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING - SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by the Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES - TAXES - WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

   (b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cap) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

   (b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterers, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per

Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.   TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a)   Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.
(b)   All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.
(c)   Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.
(d)   Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.   GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17.   (a).   QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is en passage to such port, the Charterer shall not be liable for any resulting delay.

(b)   FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.   CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.   GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:- Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20.   ISSUANCE AND TERMS OF BILLS OF LADING.

(a)   The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Charterer and the Charterer Owner of the Vessel.

(i)   CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii)   JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii)   GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv)   BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v)   LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi)   WAR RISKS.   (a)   If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b)   If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge – the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or discharge (provided such other port is not blockaded or that entry thereto or loading or discharging ports respectively established under the provisions of the Charter Party of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of contract or contracts of affreightment so far as cargo so discharged is concerned. In the event the Vessel proceeds, as provided for or ordered to, under (a) or (b) of this sub-clause, to any other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c)   The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any way pertaining to the voyage otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the Vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and such expenses.

(vii)   DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage.

Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

~~Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.~~

~~If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.~~

~~The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residues on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.~~

~~The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.~~

# BILL OF LADING

Shipped in apparent good order and condition by

on board the

whereof                                                                 Steamship/Motorship

                                                                        is Master, at the port of

to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between

and                                                                                                    , as Charterer, and

all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed                                                          Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at

                                this                    day of

                                                                                                        Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

~~loaded portion of the voyage up to a maximum of 1¼ of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.~~

## BILL OF LADING

Shipped in apparent good order and condition by
on board the
whereof

Steamship/Motorship

is Master, at the port of

to be delivered at the port of
or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London
between
all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment,                                              , as Charterer, and
    In witness whereof the Master has signed                                       and
of this tenor and date, one of which being accomplished, the others will be void.                                       Bills of Lading
    Dated at

                               this                          day of

                                                                                  Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/T "HELLENIC BLUE"/IPG – CHARTER PARTY DATED NOVEMBER 12, 2008

# IPG SPECIAL PROVISIONS
### ( REVISED 15ᵀᴴ APRIL 2004 )

| | | | |
|---|---|---|---|
| 27. *POSITION* | Vessel's present itinerary on the date of fixture is as follows : | | 1 |
| |        PORT     OPERATION     ETA     ETD | | 2 |
| | 1. | | 3 |
| | 2. | | 4 |
| | 3. | | 5 |
| | with ETA loadport    name    as    date & time (LT)   **SEE ASBATANKVOY** | | 6 |
| | | | 7 |
| 28. *SPEED* | ~~Vessel shall perform the voyage at ........ Knots, weather and safe navigation~~ | | 8 |
| | ~~permitting. Charterers have the option to instruct the vessel to reduce her speed to~~ | | 9 |
| | ~~................ Knots. Charterers shall have the option to order the vessel to increase her~~ | | 10 |
| | ~~speed. Any extra bunkers saved or consumed shall be to Charterers credit or account, the price~~ | | 11 |
| | ~~being 'at actuals' paid by the Owners at the last supply.~~ | | 12 |
| | Charter Party Speed: About 13.5 Knots, weather and safe navigation permitting. | | 13 |
| 29. *VOYAGE* | Voyage orders, as issued by the Charterers in accordance with the C/P terms and conditions, | | 14 |
| *ORDERS* | are to form an integral part of this charter party. | | 15 |
| | | | 16 |
| 30. *CERTIFICATION* | Owners warrant that the Vessel complies with all current applicable international regulatory | | 17 |
| *&* | requirements, codes and conventions including any additions/amendments which will come | | 18 |
| *DOCUMENTATION* | into force during this charter and further warrant that all ship's personnel, equipment, | | 19 |
| | fittings & procedures are in compliance with such requirements. | | 20 |
| | | | 21 |
| | Owners further warrant that all Vessel's inspections and surveys required under these | | |
| | regulatory requirements, codes and conventions by the flag state and classification society are | | 22 |
| | completed, up-to-date and will remain valid till the completion of this charter. Owners further | | 23 |
| | warrant that all original certificates, documents and survey records are on board the Vessel. | | 24 |
| | | | 25 |
| | Vessel shall not be deemed to be ready for loading or discharge if she is detained by Flag / | | |
| | Port State Control / ~~Security agencies~~ or any other authorities for any reasons prior berthing, | | 26 |
| | and all time so lost and all direct expenses shall be for Owners' account. The Charterers shall | | 27 |
| | have | | |
| | the right to claim from the Owners any direct losses they may have incurred due to such | | 28 |
| | delays. | | |
| | The NOR shall be considered null and void and Vessel shall re-tender her NOR after such | | 29 |
| | matters are cleared. | | 30 |
| | | | 31 |
| | Without prejudice to the Charterers' right to claim from Owners, any delays resulting from | | 32 |
| | non-compliance with these warranties shall not count as used laytime or demurrage if on | | 33 |
| | demurrage. All shifting costs attributable to this reason shall be for Owners account. | | 34 |
| 31. *ISPS CODE* | ~~Owners warrant that the Vessel and the Company/Operators within the meaning of this Code,~~ | | 35 |
| | ~~shall be compliant with the International Ships and Ports Security Code before the 1ˢᵗ of July~~ | | 36 |
| | ~~2004 and be fully prepared to meet any security level requirements at any port within the~~ | | 37 |
| | ~~ranges specified in Part 1 (C&D). Any additional expenses arising at any port on account of~~ | | 38 |
| | ~~this requirement shall be for Owners' account. Any delays / detentions shall not be counted as~~ | | 39 |
| | ~~used laytime, or demurrage if on demurrage.~~   **SEE BIMCO ISPS CLAUSE ATTACHED** | | 40 |
| | | | 41 |

| 32. OIL MAJORS APPROVAL | ~~Owners declare that to the best of their knowledge, the Vessel is approved by the following Oil Majors and that these approvals shall remain valid throughout the duration of this charter.~~ | 42 |
| | ~~1.~~ | 43 |
| | | 44 |
| | ~~2.~~ | 45 |
| | ~~3.~~ | 46 |
| | Approvals: to the best of Owners' knowledge, at time of fixing, but without guarantee, the vessel is acceptable on case by case basis to: Statoil, BHP, Motor Oil Hellas. | 47 |
| 33. TERMINAL SAFETY | ~~Owners warrant that~~ To the best of Owners' knowledge, the Vessel complies with all safety requirements of terminals in the | 48 |
| | port(s)/ ranges named in Part 1 (C&D), and all her equipments are in good working order. | 49 |
| | Owners shall be responsible for all delays, claims and losses if any terminal rejects the vessel | 50 |
| | on these grounds. Without prejudice to Charterers' rights to claim from Owners, any time so | 51 |
| | lost shall not count as used laytime or demurrage if on demurrage, and all expenses shall be | 52 |
| | for Owners' account. Charterers shall have the option to cancel this Charter. | 53 |
| | | 54 |
| 34. TANK CLEANING | ~~With reference to Clause 18, if the Charterers inspector is not satisfied with the cleanliness of~~ | 55 |
| | ~~the Vessel the NOR shall be considered null and void.~~ | 56 |
| | ~~If further cleaning is necessary, Charterers have the option to order further cleaning or cancel~~ | 57 |
| | ~~the C/P.~~ | 58 |
| | | 59 |
| | ~~If after further cleaning, the Charterers' Inspector is satisfied, Vessel shall re-tender NOR,~~ | 60 |
| | ~~however laytime in such case shall commence only when the vessel is securely moored at her~~ | 61 |
| | ~~designated berth.~~ | 62 |
| | ~~Should after further cleaning, Vessel is still not clean to the Charterers' inspector's~~ | 63 |
| | ~~satisfaction, Charterers shall have the option to cancel this charter or order further cleaning.~~ | 64 |
| | ~~Any time lost due to those reasons shall not count as used Laytime or demurrage, if on~~ | 65 |
| | ~~demurrage. Charterers have the right to unberth the vessel and all shifting costs attributable to~~ | 66 |
| | ~~those reasons shall be for Owners account.~~ | 67 |
| | ~~If further cleaning is required, all additional expenses incurred by the Charterers shall be for~~ | 68 |
| | ~~Owners account.~~ | |
| | With reference to Clause 18, if charterers inspector is not satisfied with the cleanliness of the vessel the NOR shall be considered null and void. If further cleaning is necessary, charterers have the option to order further cleaning. If after further cleaning, the charterers inspector is satisfied, vessel shall re-tender NOR, however, laytime in such case shall commence only when the vessel is securely moored at her designated berth. Should after further cleaning, vessel is still not clean to the charterers inspectors satisfaction, charterers shall have the option to order further cleaning. Any time lost due to these reasons shall not count as used laytime or demurrage, if on demurrage. Charterers have the right to un-berth vessel and all shifting costs attributable to these reasons shall be for owners account. If further cleaning is required, all additional expenses incurred by the charterers shall be for Owners' account. Any charterer's inspectors decisions not to be unreasonably withheld. | 69 |
| 35. BUNKER & VOID TANKS SOUNDINGS | Owners shall allow Charterers independent inspector in addition to his normal cargo | 70 |
| | gauging/sampling duties, to sound, inspect and take samples of all bunker tanks, bilge and | 71 |
| | void spaces, cofferdams and such non-cargo spaces at the time of loading and discharging. | 72 |
| | Extra time if any, to count as used laytime, or demurrage if on demurrage. | 73 |
| | | 74 |
| 36. LAYTIME | If the vessel arrives prior to the first day of laydays as per Part 1(B), she shall not tender | 75 |
| | Notice of Readiness before ~~06:00~~ 0001 hours LT on the commencing date, unless with | 76 |
| | Charterers' | 77 |

| | | |
|---|---|---|
| | sanction. Laytime shall not commence before ~~06:00~~ 0001 hours LT on the first day of the laydays. | 78 |
| | If the vessel is unable to tender her Notice of Readiness within the cancelling date & time as mentioned in Part 1(B) and the Charterers elect not to cancel this Charter Party then, notwithstanding Clause 6 hereof, laytime shall not start to count until commencement of loading. | 79 |
| | | 80 |
| | | 81 |
| 37.   EARLY | | 82 |
| | In the event that Charterers agree to load the Vessel prior to commencement of laydays, ~~all~~ 50% of | 83 |
| LOADING | such time to be offset against any time vessel is on demurrage. For the purposes of this clause, time to start counting when the Vessel is securely moored at the loadport. | 84 |
| | | 85 |
| 38.   EXCESS | The vessel shall vacate the berth upon terminal's request to do so, after disconnection of hoses. If after disconnection of hoses, the vessel remains at the berth exclusively for Owners' purposes, the Owners shall be responsible for all costs. The Charterers shall have the right to claim from the Owners any costs levied to them. | 86 |
| BERTH OCCUPANCY | | 87 |
| | | 88 |
| | | 89 |
| | | 90 |
| 39.   SUSPENSION OF | | 91 |
| RUNNING TIME | Time shall not count as used laytime or as demurrage if on demurrage, when spent or used for or lost: | 92 |
| A | | 93 |
| | Awaiting tugs, pilots, ~~tides, daylight, locks, port traffic management restrictions,~~ or any reason whatsoever over which the Charterers have no control, even if lightering has taken place at the anchorage, until the vessel is securely moored at the designated berth or other loading or discharging place specified in Part 1 (C&D) hereof. | 94 |
| | | 95 |
| | | 96 |
| | | 97 |
| | | 98 |
| B | Due to ~~overflow, inefficiency, repairs, including inability to properly heat~~ or pump out the cargo as provided in the Pumping and Cargo Heating Clauses 53 & 55 hereof. | 99 |
| | | 100 |
| C | Awaiting Shore-Reception facilities for slops or ballast or residues. | 101 |
| D | ~~Awaiting free pratique, clearances from customs, immigration or other authorities.~~ | 102 |
| E | ~~Rigging of access ladder to the vessel.~~ | 103 |
| | | 104 |
| 40.   VESSEL | Owners hereby indemnify the Charterers for any damages, costs, expenses, penalties or consequences if the Vessel is arrested/detained or other sanction is levied against the vessel or Charterers by any third party, arising out of Owners' reasons. Owners agree to assume full responsibility for all penalties arising out of this reason. | 105 |
| DETENTION / | | 106 |
| THIRD PARTY | | 107 |
| ARREST | | 108 |
| | Any delays resulting from the detention shall not count as used laytime or demurrage, if on demurrage. All shifting costs attributable to the detention shall be for Owners account. The Charterers shall have the right to claim from the Owners any losses they may have incurred due to such delays. | 109 |
| | | 110 |
| | | 111 |
| | | 112 |
| 41.   CLEAN | ~~Owners warrant that Vessel shall arrive loadport with clean ballast. Owners further warrant that the vessel has at least 2 valve segregation between ballast and cargo lines, and shall carry out the ballasting/de-ballasting operation concurrent with cargo loading/discharging operations.~~   VESSEL IS SBT | 113 |
| BALLAST | | 114 |
| | | 115 |
| | | 116 |
| | | 117 |
| 42.   BALLAST | Owners undertake to instruct Master to comply with ballast water management regulations and | 118 |
| | | 119 |
| WATER EXCHANGE | reporting to the state, local, and international authorities as applicable at the time.  In executing ballast water management, Owner warrants that approved ballast exchange method(s) will be used bearing in mind all aspects of safety and seaworthiness of the vessel. | 120 |
| MANAGEMENT | | 121 |
| | | 122 |
| | All delays, losses and expenses incurred due to vessel's non-compliance will be for Owners' account. | 123 |
| | | 124 |
| 43.   SLOPS | ~~Owners warrant that vessel shall be free of slops prior commencement of loading.~~ Charterers | 125 |
| | | 126 |
| | | 127 |

| | | | |
|---|---|---|---|
| | shall not be liable for freight or deadfreight on slops. | | |
| 44.  LOADING | Owners warrant that the vessel is capable of loading upto four (4) grades simultaneously at the | 128 | |
| | | 129 | |
| | rate of 900 m³/hour/per line/per group. | | |
| | | 130 | |
| 45.  SHORTLOADING | ~~Owners agree to indemnify the Charterers against any claims, if the vessel is unable to lift the~~ | 131 | |
| | ~~minimum agreed quantity of cargo. If the freight agreed is a lump sum amount or basis a~~ | 132 | |
| | ~~minimum quantity, the freight payable shall be prorated for the reduced cargo quantity lifted.~~ | 133 | |
| | ~~Charterers shall have the right to deduct these claim amounts at source.~~ | 134 | |
| | | 135 | |
| 46.  CARGO DYEING | The Charterers have the option to add dyes into the cargo tanks of the vessel. Such operations | 136 | |
| | | 137 | |
| | to be carried out at Charterers' time and expense and risk in accordance with vessel's cargo tanks/pumps/coating resistance list and provided that Charterers will provide the relevant LOI as per Owners' P & I Club. Clause 51 to also apply. Notwithstanding Clause 16, the Charterers | 138 | |
| | also have the option of placing packaged dyes on board to be carried to the discharge port. Any dye loaded onboard for carriage to be at Charterers' risk and Charterers shall sign a delivery receipt upon loading stating that such dye is solely for transportation purposes without any responsibility on behalf of the owners for its quality or quantity. Charterers shall be responsible for customs clearance costs and any time so used at port of delivery. | 139 | |
| 47.  DEVIATION | Owners warrant that Vessel shall have sufficient bunkers on board to perform the intended | 140 | |
| | | 141 | |
| | voyage as per Part 1(C&D). Notwithstanding clause 20 (b) (vii), on a laden voyage, the vessel | 142 | |
| | shall proceed directly to the nominated discharge port, without stopping or deviating for | 143 | |
| | bunkers, storing, crew change, repairs or any other reason (except for the purpose of saving | 144 | |
| | life) without the express agreement of the Charterers, ~~Cargo Underwriters, H&M~~ | 145 | |
| | ~~Underwriters~~ | | |
| | ~~and Vessel's P&I Club,~~ which shall not be unreasonably withheld. | 146 | |
| 48.  AWAITING | Charterers shall have the right to order the Vessel to await at safe anchorage(s) after | 147 | |
| | completion of | 148 | |
| AT ANCHORAGE | loading, or enroute to the port(s) of discharge, even though the anchorage may not be in | 149 | |
| | geographical rotation. Time spent at such anchorage(s) shall count as used laytime, or | 150 | |
| | demurrage if on demurrage from arrival to full away, but maximum sailing time until fully away on passage shall be not more 60 minutes, to be calculated per Master's statement and to be paid together with freight plus cost of any bunkers consumed. | 151 | |
| 49.  INTERIM PORTS | ~~Charterers shall have the option to order the vessel, and shall pay for, any interim~~ | 152 | |
| | ~~load/discharge port(s) calls 'on actuals'. Time for additional steaming, which exceeds direct~~ | 153 | |
| | ~~route from previous port to next scheduled port, shall be paid at the demurrage rate plus~~ | 154 | |
| | ~~bunkers consumed, plus actual port costs, if any. The reasonable, estimated costs will be~~ | 155 | |
| | ~~payable upon receipt of final invoice plus all supporting documents.~~ | 156 | |
| | SEE ABOVE | 157 | |
| 50.  SAMPLING | Charterers to have the liberty to call at a port for sampling purposes. All | 158 | |
| | deviation and port costs to be for the Charterer's account and all time spent to count as | 159 | |
| | used laytime or time on demurrage, if vessel is on demurrage from arrival to full away to be | 160 | |
| | calculated  per as per Master's statement and to be paid together with freight plus cost | 161 | |
| | of any bunkers consumed. Clause 51 to also apply. | | |
| | | 162 | |

| | | |
|---|---|---|
| 51. COMMINGLING | ~~If requested by Charterers, Owners agree to commingle, recirculate or transfer cargo / grades~~ | 163 |
| | ~~onboard as per Charterers instructions. Charterers shall indemnify the Owners against any~~ | 164 |
| | ~~claims due to such commingling, re-circulation, or transfer of cargo.~~ | 165 |
| | Charterers to have the option at their risk/time/expense to blend/circulate onboard a/o backload/reload a quantity of cargo during cargo operations in agreed load/discharge areas and/or enroute for blending/other purposes. Any cost involved including shifting between berths to be for Charterers' account and any time used to count against laytime demurrage. Bunkers consumed for all load, discharge, circulation, to be for Charterers' account and paid together with freight against master statement. Charterers to issue LOI as per Owners' P & I Club wording without bank guarantee, covering any such operations. Charterers will hold owners harmless and keep fully indemnified against all claims for contamination or quality deterioration or off-specification resulting from the cargo additive operation/blending/dyeing performed including any claims owners may have from receivers for cargo characteristics so altered Charterers to issue new cert of quality and quantity after completion of any such operations and deliver to owners the full set or original Bills of Lading and owners will issue a new set of bills of lading reflecting the cargo onboard. No pumping warranty shall apply in case of backload/reload/partial discharge. Owners have the right to take and retain composite samples prior to and following completion of any such operation. | 166 |
| 52. DISCHARGE AND RELOAD | ~~Charterers to have the additional option of discharging part or all cargo in a safe port or by~~ | 167 |
| | ~~STS transfer to another vessel and /or reloading at same or other port for further discharge~~ | 168 |
| | ~~within the agreed range. Time at the discharge/reload port to count as laytime or if vessel is~~ | 169 |
| | ~~on~~ | |
| | ~~demurrage, as time on demurrage in accordance with C/P terms and conditions. Freight~~ | 170 |
| | ~~always~~ | |
| | ~~to be based on the highest Bill of Lading quantity(ies) carried on any one part of the voyage~~ | 171 |
| | ~~or~~ | |
| | ~~the minimum quantity as per Charterparty, whichever is the greater. Reload port to~~ | 172 |
| | ~~be considered as additional loadport for freight calculation purposes.~~ | 173 |
| | Charterers to have the additional option of discharging part or all cargo in a safe port or by STS transfer to another vessel and/or reloading at same or other port for further discharge within the agreed range. Time at discharge/reload port to count from arrival to full away without exemptions and payable together with freight along with cost of additional bunkers consumed as per master's statement. Time to count as laytime or if the vessel is on demurrage, as time on demurrage. Freight always to be based on the highest bill of lading quantity(ies) carried on any one part of the voyage or the minimum quantity as pr charter party, whichever is the grater. Reload port to be considered as additional loadport for freight calculation purposes. | |
| 53. PUMPING | ~~Owners warrant that the vessel is capable of discharging 3 grades simultaneously.~~ Owners | 174 |
| | | 175 |
| | further warrant that the vessel is capable of discharging its entire homogeneous cargo capacity within 24 | 176 |
| | hours or prorata, or maintain an average of 100 psi at the vessel's rail, excluding stripping, provided shore receiving facilities | 177 |
| | permit and are capable of receiving same. Master to maintain a pumping rate & pressure log which to be ~~countersigned~~ for counter signature by the | 178 |
| | receiving terminal. Excess time taken for slow discharge not to count as used laytime or demurrage, if on demurrage. If shore facilities abandon right to gauge discharge pressure, the ships discharge pressure report shall be binding on Owners and Charterers. Pumping warranty shall not apply in case of partial discharge. | 179 |
| | | 180 |
| | | 181 |
| | If the vessel fails to comply with this warranty, the Charterers and/or receivers shall have the right to order the vessel to vacate the berth and return to berth to continue/complete the | 182 |
| | | 183 |
| | discharge operation at the next available opportunity to Charterers and/or Receivers. Time | 184 |

| | | | |
|---|---|---|---|
| | lost | | |
| | from stopping discharge till resuming discharge shall not count as used laytime or demurrage if on demurrage. All additional expenses incurred shall be for Owners' account. | | 185 |
| 54.   VESSEL TO VESSEL LIGHTERING | | | 186 |
| | ~~Owners warrant that if requested, Vessel shall perform STS lightering operation at sea or at a~~ | | 187 |
| | ~~suitable anchorage, in which event the Charterers shall provide the lighterage vessel, hoses,~~ | | 188 |
| | ~~fenders and other equipment necessary for a safe operation. Time used in such lightering~~ | | 189 |
| | ~~shall count as used laytime. Laytime shall commence as per Clause 6, or when the lightering~~ | | 190 |
| | ~~vessel is all fast, whichever occurs first, and shall cease when cargo hoses are disconnected.~~ | | 191 |
| | Charterers shall the option of performing lightering/ship-to-ship operation.  Same always to be in accordance with OCIMF, Latest Edition of Ship-to-Ship Transfer and carried out at safe and customarily used locations.<br><br>Charterers to supply all fenders/lines/hoses and any other equipment required or such operation at charterers' time and expenses and always subject to Master's approval. Time to count in full six (6) hours after tendering notice of readiness or when first lighter vessel is alongside, whichever earlier, until last line/fender is off and lighter vessel has sailed. Time lost due to tide and/or weather and/or sea conditions to count in full as laytime or demurrage if on demurrage. If vessel is required to complete cargo operation at a berth in port charterers will not have the benefit of six (6) hours notice of readiness prior berthing in port. Master to have the right to suspend any STS operations for safety reasons any applicable additional insurance to be for Charterers' account. | | 192 |
| | The lighterage location shall not count as additional discharge port or additional discharge berth when computing freight based on published Worldscale rates. Shifting time from such location to berth shall not count as used laytime, or demurrage if on demurrage. | | 193 |
| | | | 194 |
| 55. CARGO HEATING | ~~Owners warrant that—~~ | | 195 |
| I | ~~The vessel is capable of loading the cargo upto a max. of 165 degrees Fahrenheit.~~ | | 196 |
| II | ~~The Vessel is capable of and shall maintain cargo at the loaded temperature to a maximum of~~ | | 197 |
| | ~~135 deg Fahrenheit throughout the voyage and during discharge.~~ | | 198 |
| III | ~~Vessel is capable of raising cargo temperature by at least 4 deg F per day, and if ordered by~~ | | 199 |
| | ~~the~~ | | 200 |
| | ~~Charterers, shall raise cargo temperature, but always to a maximum of 135 degrees~~ | | 201 |
| | ~~Fahrenheit.~~ | | 202 |
| | ~~If the vessel fails to comply with this warranty, the Charterers and/or Receivers shall have the~~ | | 203 |
| | ~~right to order the vessel to vacate the berth and return to berth to continue/complete the~~ | | 204 |
| | ~~discharge operation at the next available opportunity. Time so lost and all additional expenses~~ | | 205 |
| | ~~incurred are to be for Owners' account.~~ | | 206 |
| | | | 207 |
| | ~~Additional costs for raising cargo temperature over the loaded temperature to be reimbursed~~ | | 208 |
| | ~~by Charterers at cost, payable against Owners' invoice and supporting documentation.~~ | | 209 |
| 56.   INERT GAS | NOT APPLICABLE | | 210 |
| | Owners warrant that the vessel is equipped with a fully functional and efficient Inert Gas System (IGS) and that the officers and crew are fully qualified, certificated and experienced in | | 211 |
| | | | 212 |
| | the operation of such a system. The IGS shall be operated when the vessel is handling cargo and ballast. In the event of IGS failure or inability of the crew to properly operate the system prior to or during cargo discharge, Owners shall ensure that discharge shall not commence, or if commenced, shall not continue until the IGS plant is restored. Time so lost shall not count as used laytime, or demurrage if on demurrage. | | 213 |
| | | | 214 |
| | | | 215 |
| | | | 216 |
| | | | 217 |
| | | | 218 |
| | If the vessel fails to comply with this warranty, the Charterers and/or Receivers shall have the right to order the vessel to vacate the berth and return to berth to continue/complete the discharge operation at the next available opportunity. Time so lost and all additional expenses incurred for mooring and unmoring the vessel and waiting to re-moor are to be for | | 219 |
| | | | 220 |
| | | | 221 |
| | | | 222 |

| | | |
|---|---|---|
| | Owners' account. | 223 |
| | If Charterers' inspectors require a physical internal inspection of the cargo tanks, de-inerting and re-inerting of the cargo tanks to be done at Charterers' time & expense. | 224 |
| 57.    CRUDE OIL WASHING | ~~Owners undertake that the vessel is equipped with a fully functional Crude Oil Washing~~ | 225 |
| | ~~System and that the officers and crew are fully qualified and experienced in the operation of~~ | 226 |
| | ~~such a system. Charterers shall have the option to order the vessel to crude oil wash all or a~~ | 227 |
| | ~~portion of the cargo tanks.~~ | 228 |
| | | 229 |
| | ~~A minimum of 12 hours shall be allowed for COW of all tanks, or prorata for less number of~~ | |
| | ~~tanks washed, in addition to the allowed laytime as agreed in Part I(H).~~ | 230 |
| | | 231 |
| | ~~Owners shall comply with applicable Port and Terminal regulations, and to submit any~~ | |
| | ~~advance information or technical data that may be required by local authorities, or follow the~~ | 232 |
| | ~~ICS/OCIMF Guidelines on COW operations in the absence of terminal instructions.~~ | 233 |
| | | 234 |
| | ~~If the vessel cannot perform COW as specified above, Charterers shall be immediately~~ ~~notified~~ | |
| | ~~with an explanation for the inability to carry out COW.~~ | 235 |
| 58.    CARGO RETENTION | NOT APPLICABLE | 236 |
| | In the event that any cargo remains on board upon completion of discharge, Charterers shall | 237 |
| | have the right to ~~deduct from freight~~ claim from Owners an amount equal to the FOB port of loading value of such | 238 |
| | cargo plus insurance and freight thereupon, provided that the volume of cargo remaining on | 239 |
| | board is liquid, or would have been liquid, pumpable and reachable by Vessel's fixed pumps according to Vessel's trim characteristics. ~~and pumpable if it was properly heated~~ ~~and/or~~ | 240 |
| | ~~vessel suitably trimmed and/or COW properly performed as determined by the cargo~~ | 241 |
| | ~~inspector.~~ Any action or lack of action in accordance with this provision shall be without | 242 |
| | prejudice to any rights or obligations of either party. | 243 |
| 59.    SHORT DELIVERY | | 244 |
| | ~~If there is a difference of more than 0.3 percent between the Bill of Lading figures and~~ | 245 |
| | ~~delivered cargo for each grade as ascertained by Customs authorities / Charterers'/ Receivers'~~ ~~inspectors~~ | 246 |
| | ~~at discharge port, Charterers have the right to deduct from freight the CIF value of the~~ | 247 |
| | ~~short delivered cargo. Owners have the right to appoint an independent surveyor to check~~ | 248 |
| | ~~cargo figures in conjunction with Customs authorities and Charterers' inspectors.~~ | 249 |
| | In addition to any other rights which charterers may have, owners shall be responsible | 250 |
| | for the full amount of any in-transit loss if such exceeds of 0.5% of total cargo and charterers shall have the right to claim from owners an amount equal to the FOB port of loading of such missing cargo pro rata, cost of freight and insurance. In-transit loss is defined as the difference between gross vessel volumes at standard temperature after loading at load port and before unloading at discharge port, to be checked by a mutual acceptable independent inspector, which the cost to be split 50/50 between Charterers and owners. | |
| 60.    BILLS OF LADING | Discharge port shown in the Bill(s) of Lading not to constitute a declaration of discharge port | 251 |
| | and Charterers to have the right to order the vessel to any port within the terms of the charter party. | 252 |
| | | 253 |
| | | 254 |
| | In such event Owners agree to discharge the cargo at that port, and Charterers shall indemnify | |
| | Owners against claims brought by holders of Bill(s) of Lading by reason of change of | 255 |
| | destination. Letter of Indemnity to be in accordance with the Owners' P + I Club wording, | 256 |
| | excluding bank guarantee. | 257 |
| | | 258 |
| | Should Bills of Lading not arrive at discharge port in time, then Owners agree to release the | 259 |
| | entire cargo without presentation of the original Bill(s) of Lading, against Charterers Letter of | 260 |

| | | |
|---|---|---|
| | Indemnity. Letter of Indemnity to be in accordance with the Owners' P + I Club wording, excluding bank guarantee. | 261 |
| | | 262 |
| | Owners to provide their LOI formats upon lifting subjects, and Charterers shall invoke the said | |
| | LOI after giving formal notice to the Owners. | 263 |
| | | 264 |
| | These indemnities shall automatically become null and void against presentation of ~~one~~ three out of | |
| | the three original Bills of lading **and marked "null and void and voyage completed and cargo delivered in good order and condition"**, or after 13 (thirteen) months after completion of discharge, | 265 |
| | **whichever occurs first, provided no proceedings or claims have been commenced / presented within this period.** | 266 |
| | | 267 |
| 61.   STATEMENT | In order to be considered an authorised document, the Notice of Readiness / Statement of | 268 |
| OF FACT | Facts and any Letter(s) of Protest issued must be signed and stamped by Master of the vessel, **and be presented for signature to** | 269 |
| | vessel's agents and terminal, and/or suppliers, and/or receivers, with names and designation of | 270 |
| | signatories ~~written clearly~~. | 271 |
| | | 272 |
| | Owners / Master of the vessel to arrange to forward to Charterers, by fax / e-mail or courier, one copy each of Notice of Readiness, Statement of Facts, Pumping logs and all Letters of | 273 |
| | Protest upon completion of loading/discharging. | 274 |
| | | 275 |
| 62.   FREIGHT | Freight for cargo loaded in excess of the agreed minimum quantity as per Part 1(E) shall be at | 276 |
| OVERAGE | ~~50% of the agreed freight rate as per Part 1 (F)~~, except where lumpsum rate has been agreed. | 277 |
| | | 278 |
| 63.   WORLDSCALE | Except as stipulated elsewhere herein, Worldscale terms and conditions and differentials | 279 |
| REFERENCE | applicable shall be as in effect on the date of Charter Party. If freight agreed is expressed as a | 280 |
| | lumpsum amount, it is understood that it includes any/all dues, taxes and charges whether | 281 |
| | levied on the vessel, freight or cargo. | 282 |
| | | 283 |
| 64.   TIME  BAR | Charterers shall be discharged and released from all liability in respect of any claim | 284 |
| | whatsoever (such as but not limited to deadfreight, demurrage, port expenses, shifting | 285 |
| | expenses ) Owners may have under this charter party unless a preliminary detailed notice of | 286 |
| | the claim has been received by the Charterers within ~~30~~ **90** days of completion of discharge **for demurrage, deadfreight, port expenses, shifting expenses only.** | 287 |
| | and followed by all supporting documents being received by Charterers' handling office in | 288 |
| | Kuwait within a period of ~~60~~ **90** days of completion of discharge. | 289 |
| | | 290 |
| 65.   OVERAGE | ~~Any extra insurance on freight and/or cargo due to vessel's age and/or Flag and/or~~ | 291 |
| INSURANCE | ~~Classification Society shall be for Owners' account and to be deducted from the freight by~~ ~~the~~ | 292 |
| | ~~Charterers.~~ | 293 |
| | | 294 |
| 66.   P & I CLUB | Owners warrant that they have a valid standard cover for Oil Pollution of USDollars 1 billion | 295 |
| | with the following P&I Club and the cover will remain in force throughout the duration of this | 296 |
| | charter. | 297 |
| | NAME OF P & I CLUB: GARD | 298 |
| | **If so requested by Charterers**, prior to lifting all subjects, Owners shall obtain a written confirmation from their P&I Club and submit to the Charterers | 299 |
| | within 1 business day of the vessel being put on subjects, stating that the Vessel is entered for | 300 |
| | Oil Pollution cover of 1 billion and the validity/expiry date of the cover. If such written | 301 |
| | evidence is not received by the Charterers within the period allowed, the Charterers have the | 302 |
| | option to allow one more day to the owners for obtaining the same or cancel this fixture. | 303 |
| | | 304 |

| | | |
|---|---|---|
| 67. CONOCO WEATHER CLAUSE | Delays in berthing for loading or discharging and any delays after berthing which are due to weather conditions shall count as one half laytime or, if on demurrage, at one half demurrage rate. | 305 306 307 |
| 68. FORCE MAJEURE | Neither Charterers nor Owners shall be liable for any damages or losses for failure or delay in performance of any obligation under this Charter, where such failure or delay occurs due to Force Majeure, i.e. Acts of God, Fires, Floods, War whether declared or undeclared, Riots, Perils of the sea, Destruction of cargo or terminals, Port closures, Restrictions imposed by governmental authorities (including allocations, priorities, requisitions, quotas and price controls), provided any such items did not exist at time of Vessel's clean fixture. | 308 309 310 311 312 313 314 |
| 69. EXXON DRUG & ALCOHOL ABUSE POLICY | Owner warrants that it has a policy of drug and alcohol abuse ('Policy') applicable to the vessel which meets or exceeds the standard in the OCIMF's publication "GUIDELINES FOR THE CONTROL OF DRUGS AND ALCOHOL ONBOARD SHIP" ('OCIMF Guidelines (Jan1995). Under the policy alcohol impairment shall be defined as 40 mg/100 ml or greater. The appropriate seafarer to be tested shall be all vessel officers and the drug/alcohol testing and screening program ('PROGRAM') shall include random or unannounced testing in addition to routine medical examinations. An objective of the policy should be that frequency of the random/unannounced testing be adequate to act as an effective abuse deterrent, and all officers be tested at least once a year through a combined programme or random/unannounced testing and routine medical examination. | 315 316 317 318 319 320 321 322 323 324 325 326 |
| | Owner further warrants that this policy will remain in effect during the term of this charter, and that Owner shall exercise due diligence to ensure that the policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence. | 327 328 329 330 |
| | It is further understood and agreed, however, that if at the time of fixture, Owner has not fully implemented the random/unannounced test portion of the policy, Owner shall satisfy its due diligence obligation in this regard if Owner has taken and continues to take reasonable steps towards such implementation. | 331 332 333 |
| 70. AGENCY | The Vessel's agents shall be nominated by Charterers at port(s) of loading and discharging, provided competitive. | 334 335 |
| | Such agents although nominated by Charterers, shall be appointed, employed and paid by the Owners, if Greece Owners' Agent. | 336 337 |
| 71. WAR RISK CLAUSE | ~~Any increase in hull and machinery war risk premiums and crew war bonus which come into effect after the date of the Charterparty will be for Charterers account after 14 days of the vessel entering the excluded zone. Any premiums, or increases thereto, attributable to closure (i.e. blocking and trapping) insurance shall be for Owners' account. For the purpose of this clause, a war risk area and associated increase in premiums will constitute that which has been declared a war risk area by 'The War Risks Rating Committee in London', as recognised by Lloyd's of London.~~ | 338 339 340 341 342 343 344 345 346 |
| | ~~Owners to give the benefit of any rebates they receive to the Charterers.~~ | 347 |
| | ~~Owners claims for such additional premiums to be fully supported with documentation.~~ | 348 |
| 72. ARAB LEAGUE BOYCOTT | Owners warrant that vessel is not subject to boycott by the Arab League and has not called any Israeli ports in the past. | 349 350 351 |
| 73. ADDRESS COMMISSION | 1.25 % address commission is payable by Owners to Charterers on freight, deadfreight and Demurrage under this Charter Party and Charterers have the right to deduct such commission at source. | 352 353 354 355 356 |

| | | | |
|---|---|---|---|
| 74.  BUNKERS SUPPLY | | ~~Owners shall give Charterers or associate companies the first option to quote for and supply bunkers to the vessel to perform this charter voyage.~~ | 357 358 |
| | | | 359 |
| 75.  ADMINISTRATION | (I) | In addition to the fixture recap, a formal written CharterParty duly signed by the Owners will be required by the Charterers evidencing all the agreed terms and conditions of this CharterParty. | 360 361 362 |
| | (II) | This Charter Party and all negotiations thereto shall be kept private and confidential by all parties involved. | 363 364 |
| | | A formal Charter Party shall be issued and signed by Owners and Charterers is so requested by either party. | 365 |

# OPTIONAL CLAUSES

## ~~INDIA CLAUSE~~

~~(I) in assessing the pumping efficiency under this charter party at ports in india, owners agree to accept the record of pressure maintained as stated in receiver's statement of facts signed by the ship's representative.~~

~~(ii) charterers will not agree charter party demurrage liabilities nor pay accordingly without receipt of the charter party signed by owners. However, charterers undertake to pay agreed demurrage liabilities promptly.~~

~~(iii) owners shall be aware of and comply with the mooring requirements of indian ports. All time, costs and expenses as a result of owners' failure to comply with foregoing shall be for owners' account.~~

## ~~SOUTH EAST ASIA CLAUSES~~

~~Chinese River Ports~~

~~If the vessel is required to call at non-coastal Chinese ports/berths, all extra inbound transit time in the river in excess of actual steaming time, is to count as laytime or time on demurrage, if vessel is on demurrage. For purposes of calculating extra transit time, time is to count upon expiry of 6 hours after arrival at first inbound pilot station, until arrival at customary anchorage for such port/berth.~~

~~All extra transit time up to dropping outbound river pilot, in excess of the actual outbound steaming time in the river, is to count as laytime or time on demurrage, if vessel is on demurrage.~~

~~For the avoidance of doubt, Huangpu, Shanghai and Nantong are, amongst others, accepted as being Chinese coastal ports.~~

~~b) South Korean Laytime.~~
~~If the vessel is required to call at South Korean port(s), should the vessel arrive at quarantine station and tender NOR between 3 hours before sunset and 0100 hours the next day, laytime, or time on demurrage, if vessel is on demurrage, shall count from 0700 hours the next day.~~

~~c) South Korean Anchor Dues.~~
~~South Korean Anchorage dues in excess of 72 hours to be for Charterer's account.~~

~~d) Japanese Speaking Superintendents~~

~~If the vessel is required to call at Japanese port(s) and if so requested by Charterers, Owners are to send, at their cost, a Japanese speaking superintendent to assist and co-ordinate the safe operation for the vessel to discharge at such nominated port(s).~~

## M/T "HELLENIC BLUE"/ IPG CP DATED 12TH NOVEMBER, 2008
## SPECIAL PROVISIONS & ADDITIONAL CLAUSES

- WORLDSCALE TERMS AND CONDITIONS TO APPLY.

- YORK /ANTWERP RULES 1974 AS AMENDED 1994.

- BIMCO ISPS CLAUSE (AS ATTACHED)

- ANY TAXES AND OR DUES ON CARGO AND OR FREIGHT TO BE FOR CHARTERERS' ACCOUNT AND SETTLED DIRECTLY BY THEM.

- ANY EXTRA INSURANCE IF ANY DUE TO VESSEL'S FLAG / AGE / CLASS TO BE FOR CHARTERERS' ACCOUNT AND SETTLED DIRECTLY BY THEM.

- ANY ADDITIONAL WAR RISK INSURANCE PREMIUM ON H+M IF ANY TO BE FOR CHARTERERS' ACCOUNT AND REIMBURSED TOGETHER WITH FREIGHT AGAINST OWNERS INVOICE. COPY OF UNDERWRITERS BILL TO BE PROVIDED SOONEST POSSIBLE. CHARTERERS SHALL BE GIVEN BENEFIT OF ANY DISCOUNT OR REBATE.

- MAXIMUM THREE HOURS AWAITING CARGO DOCUMENTS FOR OWNERS' ACCOUNT.

- CONOCO WEATHER CLAUSE TO APPLY:
  DELAYS IN BERTHING FOR LOADING OR DISCHARGING AND ANY DELAYS AFTER BERTHING WHICH ARE DUE TO WEATHER SHALL COUNT AS ONE HALF LAYTIME OR, IF ON DEMURRAGE, AT ONE HALF DEMURRAGE RATE.

  EXCEPT IF LOAD/DISCHARGE RAVENNA / ANCONA / LA NOUVELLE / FALCONARA / FIUMICINO / PORTUGAL OR VIA STS/SEALINE/LIGHTERING/LIGHTERAGE/SBM/SEA PLATFORM/TRANSHIPMENT WHERE TIME TO COUNT IN FULL AS LAYTIME OR AS FULL DEMURRAGE IF ON DEMURRAGE, WEATHER PERMITTING OR NOT. ANY UNBERTHING/REBERTHING DUE TO BAD WEATHER AND/OR SEA CONDITIONS AT ABOVE PORTS/PLACES TIME AND EXPENSES TO BE FOR CHARTERERS' ACCOUNT AND TO BE SETTLED DIRECTLY BY THEM.

- OWNERS ADDITIONAL CLAUSES

  SHIFTING TIME AND EXPENSES FROM ANCHORAGE TO FIRST BERTH NOT TO COUNT AS USED LATYTIME. ANY SUBSEQUENT SHIFTING SHALL COUNT AGAINST LAYTIME.

  IF IT SEEMS TO THE OWNERS THAT THE VESSELWILL NOT BE ABLE TO MAKE HER CANCELLING DATE, THAY SHALL ADVISE CHARTERERS OF THE NEW LAYCAN REQUIRED. CHARTERERS SHALL ADVISE OWNERS WITHIN 24 WORKING HOURS WHETHER VESSEL WILL BE MAINTAINED WITH THE NEW LAYCAN OR THAT CHARTER PARTY IS CANCELLED WITHOUT ANY COST OR CLAIM BY EITHER PARTY.

## Bimco ISPS Clause for Voyage Charter Parties

(a) (i) from the date of coming into force of the international code for the security of ships and of port facilities and the relevant amendments to Chapter xi of Solas (ISPS Code) in relation to the vessel, the owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS code relating To the vessel and "the company". Upon request the owners shall provide a copy of the relevant international ship security certificate (or the Interim international ship security certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the company security officer (CSO). (ii) except as otherwise provided in this charter party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the owners or "the company" to comply with the requirements of the ISPS Code or this clause shall be for the owners' account.

(b) (i) The Charterers shall provide the CSO and the ship security officer (SSO)/Master with their full style contact details and any other information the owners require to comply with the ISPS Code. (ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' Account and any delay caused by such failure shall be compensated at the Demurrage rate.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the vessel shall be entitled to tender notice of readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS code shall count as laytime or time on demurrage if the vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the owners to comply with the ship security plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other parties account according to this clause, the other party shall indemnify the paying party.

QUESTIONNAIRE 8B (Version 2)

**INTERTANKO'S STANDARD TANKER VOYAGE CHARTERING QUESTIONNAIRE 1988 (Version 2)**
(Metric system to be applied, HVPQ reference specified where applicable)

| GENERAL INFORMATION | | |
|---|---|---|
| Date Updated: | | HVPQ Ref |
| Vessel's name: | 14-Oct-08 | |
| IMO number: | Hellenic Blue | 1.2 |
| Vessel's previous name(s): | 8613982 | 1.3 |
| | Team Anmaj / Anmaj / Galahad | 1.4-1.7 |
| Flag: | Liberia | |
| Port of Registry: | | 1.8 |
| Call sign: | | 1.9 |
| Inmarsat phone number: | ELUN9 | 1.11 |
| Fax number: | 1261273 | 1.12 |
| Email address: | 1261274 | 1.13 |
| Type of vessel: | hblue@mantinia.com.gr | 1.16 |
| Type of hull: | Oil Tanker | 1.17 |
| | Double Side | 1.19 |
| OWNERSHIP & OPERATION | | |
| Registered owner - Full Style: | Prespes Shipping Corp. MONROVIA - LIBERIA. C/o MANTINIA SHIPPING CO SA, 51, AKTI MIAOULI STREET, 18536 PIRAEUS, GREECE Tel: +302104295050 Fax: +302104295059 Telex: 212260 / 213145 (A/B Email: mantinia@otenet.gr | 1.20 |
| Technical operator - Full Style: | MANTINIA SHIPPING CO SA 51, AKTI MIAOULI STREET, 18536 PIRAEUS, GREECE Tel: +302104295050 /8 Fax: +302104295059 Telex: 21 31 45 Email: mantinia@otenet.gr | 1.22 |
| Commercial operator - Full Style: | | |
| Disponent owner / Bareboat charterer - Full Style: | | |
| Number of vessels in disponent owner's fleet:: | | 1.25 |
| BUILDER | | |
| Where Built : | | |
| Date Delivered: | Daewoo Shipbuilding Okpo South Korea | 1.26 |
| | Oct 27, 1988 | |
| CLASSIFICATION | | 1.31 |
| Vessel's classification society: | | |
| Class notation: | Det Norske Veritas | 1.34 |
| | DET NORSKE VERITAS, +A1 Tanker for Oil Products ESP | 1.35 |
| If Classification society changed, name of previous society? | N/A | |
| If Classification society changed, date of change? | | 1.36 |
| Last dry-dock: | 05-Oct-2008 | 1.37 |
| Last special survey: | 05-Oct-2008 | 1.38 |
| | | 1.41 |

| | | | | |
|---|---|---|---|---|
| Latest CAP Rating (if applicable) | | | | |
| Last annual survey: | | | 1 (Hull) | 1.44 |
| | | | 05-Oct-2008 | 1.45 |
| Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS)? | | | Yes | |

**DIMENSIONS**

| | | | | |
|---|---|---|---|---|
| LOA (Length Over All): | | | | |
| Extreme breadth: | | | 178 Metres | 1.49 |
| KTM (Keel to Masthead): | | | 30.4 Metres | 1.51 |
| BCM (Bow to Center Manifold): | | | 47.8 Metres | 1.54 |
| Lightship parallel body length: | | | 90.6 Metres | 1.57.1 |
| Normal ballast parallel body length: | | | 78.3 Metres | 1.57.3 |
| Parallel body length at Summer DWT: | | | 82.6 Metres | 1.57.6 |
| | | | 87 Metres | 1.57.9 |

**TONNAGES**

| | | | | |
|---|---|---|---|---|
| Net Tonnage: | | | | |
| Gross Tonnage: | | | 11841 | 1.59 |
| Suez Net Tonnage: | | | 27736 | 1.60 |
| Panama Net Tonnage: | | | 31014.08 | 1.61 |
| | | | 31032 | 1.62 |

**LOADLINE INFORMATION**

| | Freeboard (Metres) | Draft (Metres) | Deadweight (Tonnes) | Displacement (Tonnes) | |
|---|---|---|---|---|---|
| Summer: | 5813 Metres | 12.54 Metres | 44772.3 Metric Tonnes | 53964.1 Metric Tonnes | 1.63 |
| Winter: | 6073 Metres | 12.28 Metres | 43556.5 Metric Tonnes | 52716.7 Metric Tonnes | 1.64 |
| Tropical: | 5553 Metres | 12.8 Metres | 46053.4 Metric Tonnes | 55213.6 Metric Tonnes | 1.65 |
| Lightship: | 15272 Metres | 2.626 Metres | 0 Metric Tonnes | 9160.2 Metric Tonnes | 1.66 |
| Normal Ballast Condition: | 11979 Metres | 6.374 Metres | 16250 Metric Tonnes | 25442 Metric Tonnes | 1.67 |

| | | | | |
|---|---|---|---|---|
| TPC on summer draft: | | | 48 Metric Tonnes (TPI: 121.92 Metric Tonnes) | 1.70 |
| Does vessel have Multiple SDWT? | | | No | 1.72 |
| If yes what is the maximum assigned Deadweight? | | | Metric Tonnes | 1.73 |
| Air draft (sea level to top of mast/highest point) in normal SBT condition? | | | 41.426 Metres | 1.74 |

**RECENT OPERATIONAL HISTORY**

| | | | | |
|---|---|---|---|---|
| Has vessel been involved in any collision, grounding or pollution incident the past 12 months, full description: | | | Pollution: No Grounding: No Collision: No | 1.77-1.79 |

**CERTIFICATION**

| | | | | |
|---|---|---|---|---|
| Owners warrant following certificates to be valid throughout the Charter Party period: | | | | |
| SOLAS Safety Equipment: | | | | |
| SOLAS Safety Radio: | | | 05-MAR-2009 | 2.2 |
| SOLAS Safety Construction: | | | 05-MAR-2009 | 2.3 |
| Load line: | | | 05-MAR-2009 | 2.4 |
| IOPP: | | | 05-MAR-2009 | 2.5 |
| Safety Management (ISM): | | | 05-MAR-2009 | 2.6 |
| USCG COC: | | | 29-Jan-2011 | 2.8 |
| CLC: | | | 05-Sep-2009 | 2.11 |
| US COFR: | | | 20-Feb-2009 | 2.13 |
| Certificate of Fitness (Gas/Chemicals): | | | 03-Aug-2011 | 2.15 |
| Certificate of Class: | | | | 2.16 & 2.17 |
| ISPS ISSC: | | | 05-MAR-2009 | |
| | | | 29-Jan-2011 | |

**DOCUMENTATION**

| | | | | |
|---|---|---|---|---|
| Does the vessel have the following documents on board? | | | | |

| | | |
|---|---|---|
| International Safety Guide for Oil Tankers & Terminals (ISGOTT): | Yes | |
| OCIMF/ICS Ship to Ship Transfer Guide (Petroleum): | Yes | 2.28 |
| Is the vessel entered with ITOPF? | Yes | 2.31 |
| **CREW MANAGEMENT** | | |
| Nationality of Master | | |
| Nationality of Officers: | Greece | |
| Nationality of Crew: | GREEK & FILIPINO | 3.1 |
| If Officers/Crew employed by a Manning Agency - Full Style: | FILIPINO | 3.2 |
| | Officers: Bright Maritime Corp. | 3.1 & 3.2 |
| | Crew: Bright Maritime Corp. | |
| What is the common working language onboard? | English | |
| Do key officers understand English? | Yes | 3.1 |
| In case of Flag Of Convenience (FOC), Is the ITF Special Agreement on board? | Yes | |
| **STRUCTURAL CONDITION** | | |
| Are cargo tanks coated? | Yes | |
| If Yes, specify type of coating: | Amercoat 82/82A | 7.1.1 |
| If cargo tanks are coated, specify to what extent: | Whole Tank | 7.1.1 |
| Are slop tanks coated? | Yes | 7.1.3 |
| If slop tanks are coated, specify to what extent: | Whole Tank | |
| **CARGO & BALLAST SYSTEMS** | | |
| If double hull, is vessel fitted with centreline bulkhead in all cargo tanks? | No, | 8.2 |
| Groups / Tank Capacities | | 8.3 |
| | Seg #1: 12574 m3 (1C+6C+SLOPS) Seg #2: 14266 m3 (2C+4CP+7C) Seg #3: 14814 m3 (3C+4CS+8C) Seg #4: 10883 m3 (5CS+5CP+9C) | |
| Total cubic capacity 98% ex slop tank: | 51,011 Cu. Metres | 8.4 & 8.6 |
| Slop tank(s) capacity 98%: | 1,526.2 Cu. Metres | 8.5 & 8.7 |
| SBT or CBT? | SBT | |
| If SBT, what percentage of SDWT can vessel maintain with SBT only? | 37 % | 8.14.2 |
| If SBT, does vessel meet the requirements of MARPOL Reg 13(2)? | Yes | 8.14.3 |
| Number of natural segregations with double valve: | 4 | 8.15 |
| **CARGO PUMPS** | | |
| Type / number / capacity: | 4 x 1000 Cu. Metres/Hour (Centrifugal) | 8.18-8.25 |
| **GAUGING AND SAMPLING** | | |
| Can tank innage/ullage be read from the CCR? | Yes | 8.48 |
| Can vessel operate under closed conditions in accordance with ISGOTT 7.6.3? | Yes | 8.51 |
| Type of tank gauging system (radar / floating / other) | Other (Specify) Scarpenord with pressure sensors | 8.51.1 |
| Are high level alarms fitted and operational in cargo tanks? | Yes | 8.54 |
| **VAPOUR EMISSION CONTROL AND VENTING** | | |
| Is a vapour return system fitted? | Yes | 8.65 |
| State what type of venting system is fitted: | Individual High Velocity | 8.67 |
| Max loading rate per midships connection for homogenous cargo? | 2000 Cu. Metres/Hour (per manifold) Cu. Metres/Hour (total) | 8.79 |
| **CARGO MANIFOLDS** | | |

| | | |
|---|---|---|
| Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes | 8.80 |
| What is the number of cargo connections per side? | 4 | 8.83 |
| What is the size of cargo connections? | 300 Millimetres | 8.84 |
| What is the material of the manifold? | Steel | 8.86 |
| Distance between cargo manifold centres: | 2000 Millimetres | 8.93 |
| Distance ships rail to manifold: | 4600 Millimetres | 8.95 |
| Distance main deck to centre of manifold: | 1830 Millimetres | 8.97 |
| Height of manifold connections above the waterline at loaded (Summer Deadweight) condition? | 8.86 Metres | 8.101 |
| Height of manifold connections above the waterline in normal ballast? | 14.809 Metres | 8.102 |
| Is vessel fitted with a stern manifold? | No | 8.104 |
| Number / size reducers: | 8 x 300/400mm (12/16")<br>4 x 300/300mm (12/12")<br>4 x 300/250mm (12/10")<br>4 x 300/200mm (12/8")<br>2 x 300/150mm (12/6") | 8.106-8.110 |
| **CARGO HEATING** | | |
| Type of cargo heating system? | | |
| Material of heating system? | | |
| Max load temp: | | 8.120 |
| Max temp maintain: | | 8.128 |
| **IGS & COW** | | |
| Is an Inert Gas System (IGS) fitted? | | |
| Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | Yes | 9.1 |
| Is a Crude Oil Washing (COW) Installation fitted? | IG Generator | 9.3 |
| | N/A | 9.17 |
| **MOORING ARRANGEMENTS** | | |
| Number / length / diameter of wires: | | |
| | None | 10.2-10.5 |
| Breaking strength of wires: | | |
| | None | 10.2-10.5 |
| Number / length / diameter of ropes: | | |
| | On Drums<br>Forecastle: 2 / 220 Metres / 64 Millimetres<br>Fwd main deck: 2 / 220 Metres / 64 Millimetres<br>Aft main deck: 2 / 220 Metres / 64 Millimetres<br>Poop: 2 / 220 Metres / 64 Millimetres<br><br>Other Lines<br>Forecastle: 4 / 220 Metres / 56 Millimetres<br>Fwd main deck: 2 / 220 Metres / 80 Millimetres<br>Aft main deck: 2 / 220 Metres / 80 Millimetres<br>Poop: 4 / 220 Metres / 0 Millimetres | 10.11-10.18 |
| Breaking strength of ropes: | | |
| | Forecastle: 74.6 Metric Tonnes<br>Fwd main deck: 70.4 Metric Tonnes<br>Aft main deck: 70.4 Metric Tonnes<br>Poop: 74.6 Metric Tonnes | 10.11-10.18 |
| Number and brake holding power of winches: | | |
| | Forecastle: 2 / 44 Metric Tonnes | 10.22-10.25 |

| | | |
|---|---|---|
| | Fwd main deck: 1 / 48.1 Metric Tonnes Aft main deck: 1 / 47 Metric Tonnes Poop: 2 / 48.1 Metric Tonnes | |
| How many closed chocks and/or fairleads of enclosed type are fitted on: | | |
| Focsle: | 5 CHOCKS / 4 FAIRLEADS | |
| Main deck fwd: | 2 CHOCKS / 2 FAIRLEADS | |
| Main deck aft: | 2 CHOCKS / 2 FAIRLEADS | |
| Poop: | 9 CHOCKS / 4 FAIRLEADS | |
| **SINGLE POINT MOORING (SPM) EQUIPMENT** | | |
| Fairlead size: | 600x450x25 | 10.48 |
| Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | Yes | 10.60 |
| Is vessel fitted with chain stopper(s)? | Yes | 10.61 |
| Number: | 2 | 10.61.1 |
| Type: | Tongue & Smith Bracket | 10.61.2 |
| SWL: | 200 Metric Tonnes | 10.61.3 |
| Max diameter chain size: | 76 Millimetres | 10.62 |
| **LIFTING EQUIPMENT** | | |
| Derrick(s) - Number / SWL: | | |
| Cranes(s) - Number / SWL: | 2 / 10 Metric Tonnes | 10.75 |
| **ENGINE ROOM** | | 10.76 |
| What type of fuel is used for main propulsion? | IFO 180Cst | 12.5 |
| What type of fuel is used in the generating plant? | MDO/MDO | 12.14 |
| **MISCELLANOUS** | | |
| P & I Club name: | | |
| Last three cargoes (Last / 2nd Last / 3rd Last): | GARD | |
| Last three charterers (Last / 2nd Last / 3rd Last): | | |
| Last three voyages (Last / 2nd Last / 3rd Last): | | |
| Date of last SIRE Inspection: | | |
| Date of last CDI Inspection: | N/A | |
| Current Oil Major Company Acceptances (TBOOK): | | |
| Date and place of last Port State Control: | | |
| Any outstanding deficiencies as reported by any Port State Control? If yes, provide details: | No | |
| **FOR USA CALLS ONLY** | | |
| Qualified individual (QI) - Full Style: | GHALLAGHER MARINE SYSTEM INC 100 CENTURY PARKWAY , SUITE 130 MOUNT LAUREL, NJ 08054 Tel: +1-703-683-4700 Email: gmsi@chgms.com | |
| Oil Spill Response Organization (OSRO) -Full Style: | GHALLAGHER MARINE | |

| | SYSTEM INC<br>100 CENTURY<br>PARKWAY , SUITE 130<br>MOUNT LAUREL, NJ<br>08054<br><br>Tel: +1-703-683-4700<br>Email: gmsi@chgms.com | |
|---|---|---|
| Has owner, manager, or operator signed the Sea Carrier Initiative agreement with US customs concerning drug smuggling? | No | |

Revised: July 2004 (INTERTANKO.com / Q88.com)

# EXHIBIT "B"

```
From: mrezzo@mjlf.ch
      <mrezzo@mjlf.ch@SMT>
To  : chartering@mantinia-shipping.com          Sent    02/12/2008 12:01
      <chartering@mantinia-shipping.com@SMT>
Date: 02 December 2008 12:01 Msg: MANTIN-1190582
Sub : HELLENIC BLUE / IPG CP DATED 12TH NOVEMBER, 2008 - ADDENDUM NO 1 -
```

MALLORY JONES LYNCH FLYNN AND ASSOCIATES

TO: IPG
ATTN: MR ABDULLAH KARKOUH

TO: MANTINIA
ATTN: MR TASOS PANTELIAS

FM: MATTEO REZZO

RE: HELLENIC BLUE / IPG CP DATED 12TH NOV, 2008 - ADDENDUM NO 1 -

ADDENDUM NO 1 DATED 1ST DECEMBER, 2008
----------------------------------------

IT IS MUTUALLY AGREED BETWEEN OWNERS/CHARTERERS TO AMEND THE ABOVE
MENTIONED C/P AS FOLLOWS:

Charterers option to call Malta and return to Lebanon as per herebelow
conditions:

1- All time from sailing Lebanon until the return to Lebanon and completion
of discharge will be compensated to Owners per day pro rata at the daily
demurrage rate and paid together with the freight free of commission.

2 - Charterers will pay for bunkers consumed on the passage from Lebanon to
Malta and from Malta to Lebanon together with those consumed for cargo
operations and will pay for the costs of such bunkers and all port and
other expenses together with the freight.

It is understood that the all time from vessel arrival in Lebanon on 25th
November 07:30 local time until vessel sails, shall count against Laytime
and/or Demurrage in full."


END ADDENDUM

+++

BEST REGARDS,

Matteo Rezzo
MJLF - Geneva
Tel: +41 22 901 3000
Mob: +41 79 386 9264
Fax: +41 22 901 3030
Email: mjlf-geneva@mjlf.ch
Direct: mrezzo@mjlf.ch
Yahoo: matteorezzo